UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AARON CUNNINGHAM and
SANIA DAVIS,

                        Plaintiffs,


            -against-


VIACOMCBS,

                        Defendant.

22-CV-_____ (___)

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Aaron Cunningham ("Cunningham") and Sania Davis ("Davis") (collectively, "Plaintiffs"), by and through their attorneys, for their Complaint against defendant ViacomCBS (now known as Paramount),[1] allege as follows:

## NATURE OF ACTION

1.      Cunningham, who is Black and of African descent, was employed by ViacomCBS from August 2019 to August 2021, working as the Vice President of Direct to Consumer.

2.      Davis, who is Black and of African descent, was employed by ViacomCBS from January 2021 to August 2021, working as the Director of Direct to Consumer.

3.      Cunningham and Davis each have over 15 years of e-commerce experience, and are highly-qualified and well-respected for developing and growing e-commerce businesses.

---

[1]      Plaintiffs were employed by ViacomCBS.  In February 2022, ViacomCBS announced that it would become known as "Paramount."   https://www.cbsnews.com/amp/news/paramount-viacomcbs-name-change-company/

4.      Cunningham and Davis worked together in the Direct-to-Consumer department of the Consumer Products organization at ViacomCBS, where both were terminated shortly following their complaints to Human Resources regarding differential and discriminatory treatment based on race, racial harassment and retaliation.

5.      From 2019 until his termination from ViacomCBS, Cunningham was repeatedly subjected to discrimination because of his race and retaliated against for raising complaints of race discrimination.

6.      From January 2021 until her termination from ViacomCBS, Davis was repeatedly subjected to discrimination because of her race and retaliated against for raising complaints of race discrimination.

7.      Plaintiffs were both set up to fail at their respective positions at the outset – they were constantly denied support and decisions based upon their experience and expertise were repeatedly overturned to the detriment of their perceived performance.  Further, Plaintiffs were excessively monitored, their recommendations and performance brought into question, and were issued unwarranted disciplinary action.

8.      Despite Cunningham and Davis' various good-faith complaints to ViacomCBS' Human Resources Department about racial discrimination, harassment, lack of resources provided to Black employees to set them up for failure, and other unlawful conduct, ViacomCBS took no corrective action against racial discrimination, harassment, or against any individuals reported for discriminatory or harassing conduct.  Instead, ViacomCBS condoned and acquiesced in the unlawful conduct toward Cunningham and Davis, allowed retaliation against each of them, and terminated these two Black employees after they reported unlawful conduct.

9.      Plaintiffs bring this lawsuit against ViacomCBS to recover all equitable and monetary relief available under the law – including economic, compensatory and punitive damages, as well as interest, attorneys' fees and costs – for race discrimination, harassment and retaliation in violation of 42 U.S.C. § 1981 ("§ 1981"), Title VII of the Civil Rights Act of 1964 ("Title VII"), the New York City Human Rights Law, N.Y.C. Administrative Code § 8-107 *et seq.* ("CHRL"), and the New York State Human Rights Law, N.Y. Executive Law § 290 *et seq.* ("SHRL").

## THE PARTIES

10.     Cunningham resides in Brooklyn, New York.

11.     Davis resides in New York, New York.

12.     ViacomCBS operates a corporate office in New York, New York.

13.      At all times material hereto, ViacomCBS was Plaintiffs' "employer" within the meaning of Title VII, the CHRL and SHRL.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

14.     On November 3, 2021, Cunningham submitted an inquiry with the Equal Employment Opportunity Commission ("EEOC") against ViacomCBS. On January 25, 2022, Cunningham amended his inquiry and submitted his Charge of racial discrimination, hostile work environment, retaliation, and unlawful termination against ViacomCBS.

15.     On April 13, 2022, the EEOC issued, upon Cunningham's request, a Dismissal and Notice of Rights, so that he could file this lawsuit with this Court under Title VII.  This lawsuit has been filed within 90 days after the EEOC issued the Dismissal and Notice of Rights to him.

16.     On November 3, 2021, Davis submitted an inquiry with the EEOC against ViacomCBS. On January 25, 2022, Davis amended her inquiry and submitted a Charge of racial

discrimination, hostile work environment, retaliation and unlawful termination against ViacomCBS.

17.     On May 9, 2022, the EEOC issued, upon Davis' request, a Dismissal and Notice of Rights, so that she could file this lawsuit with this Court under Title VII.  This lawsuit has been filed within 90 days after the EEOC issued the Dismissal and Notice of Rights to her.

18.     Following the commencement of this action, a copy of this Complaint will be served both on the New York City Commission on Human Rights and the Office of Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the CHRL.

## JURISDICTION AND VENUE

19.     The causes of action which form the basis for this lawsuit arise under § 1981, Title VII, the CHRL and the SHRL.

20.     This Court has jurisdiction over Plaintiffs' § 1981 and Title VII claims pursuant to 28 U.S.C. § 1331, and the Court may exercise supplemental jurisdiction over the claims under the CHRL and SHRL, pursuant to 28 U.S.C. § 1367.

21.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices and conduct set forth herein, occurred in this District.

## FACTS

22.     Cunningham is an African American man with over 15 years of e-commerce experience at corporations including Amazon, Walmart, Nordstrom, Macy's.  Cunningham began working for Viacom as the Vice President of Direct to Consumer ("DTC") on August 21, 2019, and continued within the same position after the Viacom-CBS merger.  ViacomCBS terminated Cunningham's employment on August 4, 2021, following his complaints to Human Resources

regarding differential and discriminatory treatment based on race.  During his employment with ViacomCBS, Cunningham was subjected to racial discrimination, harassment and retaliation by ViacomCBS management and Human Resources.

23.     Davis is an African American woman with over 15 years of e-commerce experience at corporations including Amazon, Macy's, Saks Fifth Avenue and Neiman Marcus.  Davis began working for ViacomCBS as the Director of DTC on January 19, 2021. ViacomCBS terminated Davis' employment on August 6, 2021, following her complaints to Human Resources regarding differential treatment, harassment and discriminatory treatment based on race.  During her employment with ViacomCBS, Davis worked under Cunningham, Vice President of DTC, and Jose Castro ("Castro"), Senior Vice President of licensing, fashion collaborations, specialty retail and DTC.

24.     The position goals for Cunningham and Davis were set by expectations of double-digit revenue for the ViacomCBS DTC e-commerce business.  As such, every decision or suggestion made in the DTC team was through the lens of objective financial e-commerce expertise.

25.     Throughout their employment, Cunningham and Davis were made aware of the historical records of complaints of discrimination and disparate treatment based on race in the Consumer Products Organization.  Further, the lack of racial representation was unmistakable: out of a group of over 200 employees from the Consumer Products Organization, there were less than 10 Black employees, only two of which held Vice President positions.

26.     Throughout 2019 to 2021, there was a distinct lack of team structuring and support provided to the primarily Black DTC team.  Immediately after Cunningham started his employment at ViacomCBS, he noticed a lack of support, lack of representation and uneven

allocation of resources for Black talent. While other departments had well-resourced and well-staffed teams of at least 5 to 6 employees, the DTC team had only 2 people (Cunningham and Gina McCullars, a temporary employee), rather than 5-6 people as had been discussed in his initial interview and in the planning out of the DTC team. With the merger of Viacom and CBS, Cunningham inherited the CBS DTC team, including Davette Zachary ("Zachary") (Director of DTC), Danielle Leahan ("Leahan") (Manager of DTC), and Emily Buckingham (Coordinator of DTC). Despite this addition to the DTC team, the DTC team remained short-staffed in comparison to other departments at ViacomCBS.

27.     Additionally, Buckingham was removed from the DTC team in May 2020 and Zachary left ViacomCBS in October 2020, leaving the DTC team as a staff of two people spearheading the newly-established DTC business until Davis joined as Director of DTC in January 2021. Even then, the DTC team consisted of three permanent employees and continued to be understaffed and under-resourced throughout 2021. In comparison to the DTC team, other teams at ViacomCBS generally had two directors and two coordinators in addition managerial positions (at least 6 employees).

28.     On numerous occasions in September 2019, June 2020, July 2020 and October 2020, Cunningham inquired about the staffing of the DTC team. In September 2019, Cunningham met with Courtney Oliver ("Oliver") as a formal introduction to Human Resources and discussion of the team structure and support Cunningham was to receive in building the DTC team. Despite the discussion of DTC team structure, the staffing and support was never realized. Cunningham approached Castro in June 2020, following the removal and reassignment of Buckingham. In his complaint to Castro regarding the decision to remove Buckingham from the DTC team he asked, "even though I have been requesting help, why is this help being taken away?" Castro responded

with, "that's just how it is."  In July 2020, there were additional informal complaints made to Castro and Oliver, in which Cunningham discussed the uneven allocation of resources for his team.

29.     In October 2020, shortly after the resignation of Zachary, Cunningham filed an official complaint with Oliver regarding behavioral issues and allocation of staff and resources.  In the portion of his complaint regarding the staffing of the DTC team, Cunningham described how resources and staff had been removed, that the lack of resolution to Zachary's complaints caused her eventual resignation, and that there were five people less than planned, and that all of these circumstances impacted the success of the DTC business.  He further provided that, with the ViacomCBS merger, the work and business had doubled and the team had remained short-staffed.  Cunningham was told by Oliver, "we will give you the support soon, so sit tight."  However, the only support received was in January 2021, with the hire of Davis.  Cunningham did not receive additional support or staffing to fill the DTC team.

30.     On or around November 12, 2020, Cunningham spoke to Dion Vlachos ("Vlachos") regarding a conversation between Vlachos and Castro.  Vlachos relayed to Cunningham that during this meeting, Castro expressed frustration to Vlachos regarding the DTC team, asking him, "why does [Aaron Cunningham] keep asking for help?"

31.     The lack of staffing and support for the DTC team persisted through 2021.  Despite Cunningham and Davis' requests for support and staff, further detailed in the investigation emails sent to Jennifer Gordon (Vice President of Employee Relations), Talia Robinson (Senior Vice President of Human Resources), and Fania Washington (Senior Vice President of Employment Law Team), there were no additional staff and resources provided to the DTC team.

32.     Issues surrounding discriminatory behavior and disparate treatment became prevalent with the merger of Viacom and CBS.  Cunningham was made aware of the frustrations

7

faced by Zachary and other Black employees, including multiple complaints submitted by Black employees concerning Maggie Plattner ("Plattner"), who is Caucasian, due to her behavior of harassment and disparate treatment.  Cunningham was made aware of Plattner's habits of challenging the expertise of Black employees, pushing back against decisions made, and otherwise going over their heads to overturn decisions.  Furthermore, after the merge of Viacom and CBS, Plattner expressed frustration on numerous occasions regarding Cunningham taking over a part of her role.  In learning about other employee experiences, Cunningham noticed many Black employees were sent to Oliver, who would generally shut down racial bias complaints.

33.     In February 2020, Cunningham first submitted "informal" complaints to Castro and Andrea Fasulo ("Fasulo"), Senior Vice President of Consumer Products Marketing.  During separate 1-on-1 meetings with Castro and Fasulo, Cunningham detailed challenging interactions with Plattner and the DTC team, and corroborating evidence provided by Zachary.  Cunningham detailed how Plattner would act as a blocker for business decisions that needed to move forward for the DTC team to succeed.  Cunningham detailed aggressive interactions in which Plattner would respond in meetings at least twice a week.  Cunningham expressed that, despite Plattner's lack of expertise in the DTC business, she would often tell Cunningham and the DTC team during meetings: "this isn't the correct way," "I've never done it this way," or "you don't know what you're doing."  Despite his complaint to Castro and Fasulo, there was no resolution to this complaint.

34.     Cunningham noticed that Castro generally took the word of Plattner, regardless of countless examples of disparate treatment. Cunningham felt that in many of the complaints made, there was a presumption of his lack of knowledge, despite his expertise.

35.     In May 2020, Cunningham experienced several occasions in which higher management overturned his decisions with no basis for doing so.  Plattner and Veronica Hart, EVP of Brand Franchise Planning and Plattner's manager, would directly contact Castro in order to overturn decisions made by the DTC team.

36.     Frustrations in June and July 2020 continued to grow, as there was no action or resolution to complaints that Cunningham and Zachary escalated.  Cunningham again discussed the uneven allocation of resources to his team, the overturning of business decisions without proper objective support, and the tumultuous environment with Plattner.  Plattner would often reach out directly to Castro to overturn decisions made by the DTC team.

37.     In one instance, there was a request to launch a Comedy Central storefront. Comedy Central had the smallest catalogue of media, and after a thorough financial analysis, the DTC team concluded that the storefront should not be launched and there was no viable business model.  Despite the analysis and decision made, Plattner asked Castro for the storefront to go forward regardless of the risk, and her decision was prioritized over the DTC analysis and determination.  When the Comedy Central DTC storefront performed subpar, it was then blamed on the DTC team, specifically Cunningham and later, Davis.

38.     After requesting assistance weeks in advance, Cunningham was delayed in crossing the finish line with the launch of BET's DTC site due to a lack of resourcing.  Cunningham was left with the fewest resources while launching and supporting the only Black brand, BET.  He was operating the other 6 DTC sites while attempting to launch Comedy Central and BET with just one unexperienced manager, during peak sale season. Cunningham was embarrassed and demoralized and left to be the blamed for the lack of success.

39.     In June 2020, during the Black Lives Matter movement intensified by the George Floyd and Breonna Taylor incidents, there was a showing of solidarity by ViacomCBS. Bob Bakish, the President and CEO of ViacomCBS, and Brian Robbins ("Robbins"), President & CEO of Paramount Pictures, Nickelodeon and Chief Content Officer of Paramount +, released statements expressing support of the Black Lives Matter movement.  In addition, Robbins had Nickelodeon go dark for 8:46 to echo the time that George Floyd was asphyxiated.  During the start of a meeting in which the DTC team was waiting to meet with another team, Grace Lo, Kenny Martinez, Davette Zachary, Emily Buckingham, Plattner, and Chloe Bethel were on a call and there was a brief casual conversation.  At that time, Plattner started commenting on the Black Lives Matter movement and protests as pointless riots.  Ms. Plattner made comments such as, "These thugs tearing up our city;" "I can't believe this, the city is a disaster, my dry cleaner has a window broken out;" "I don't know why they are doing this."  Ms. Plattner asked people on the call, "how is the rioting near you?"  The team remained silent, and Zachary was visibly upset by this conversation.  These comments were perceived as inconsiderate, rude, upsetting, and displayed no understanding of the reason for the BLM movement.  Following the meeting, Zachary reached out to Plattner, expressing concerns about Plattner's comments and asking her to apologize to Cunningham.  Plattner did verbally apologize to Cunningham in a future meeting, but only after being asked to do so.

40.     Following the meeting, Zachary also reached out to Cunningham to discuss the incident.  Zachary affirmed similar sentiments that Cunningham felt, namely: the comments made were upsetting and disheartening.   Zachary also expressed to Cunningham, "you have an understanding of who I have been dealing with for the past years, and now you have a better

understanding of who you're dealing with."  She informed Cunningham that she sent Plattner a note about how insensitive and disheartening Plattner's comments had been.

41.     Later in the week, Cunningham had a one-on-one meeting with Castro.  Despite the company's statement and actions of solidarity, Castro informed Cunningham, "I know there is a lot going on. I just want to let you know, everyone does not have the same political beliefs or similar political causes."  This statement expressed a disconnect between the publicized ViacomCBS position and the way in which internal positions differed.  Cunningham responded to Castro, "After the released statements, I wasn't aware this was a political statement, I thought this was a human rights statement."  Castro defended his point by relating it to his experience when people had called him incorrect names or made incorrect assumptions due to his name in the past, "but you have to roll with the punches."

42.     On or around July 2020, Zachary reached out to Human Resources and Castro regarding past complaints that she had expressed and the recent tumultuous environment.  Despite Zachary's complaints, no one reached out to Cunningham to corroborate or confirm the information provided by Zachary.  Cunningham had shared these experiences with Zachary and had escalated many of the prior concerns to Castro.  However, there was no action or resolution to Zachary's complaints and she felt forced to resign in October 2020.

43.     Upon Zachary's departure from ViacomCBS in October 2020, Cunningham set up a meeting with Oliver to address concerns and complaints that had gone unresolved, and additional concerns.  Cunningham had been experiencing hostility and aggression from Plattner and Amanda Klecker ("Klecker"), who is Caucasian, and reported the differential treatment and pattern of hostile behavior directed toward him based on his race.  Cunningham met with Oliver over Zoom to file an official complaint.  During this video call, Cunningham discussed the lack of resources

and staffing, as well as the treatment and hostility he was experiencing.  Cunningham explained that all of these factors impacted the DTC business.  He also conveyed that, despite the work having doubled after the Viacom and CBS merger, the DTC team was given fewer resources and continued to be understaffed.  He explained that he had raised concerns numerous times, but that his concerns were not addressed and often shrugged off.  Cunningham also expressed that this was an issue of discrimination and disparate treatment, made "clear by the pattern I have been seeing." Toward the conclusion of this meeting with Oliver, she responded by telling Cunningham: "*don't use the race card; don't make this about race*.  We will give you the support [for the DTC team] soon so hang tight."  Cunningham felt disheartened by the conclusion of the meeting and what was told to him.  As with prior complaints, he was not aware of any action taken as a result of his complaint.  Oliver only once followed up with him when recruiting Davis, but this was an informal conversation in January 2021, during which Oliver stated, "I think things will get better now, you have more support."  However, there was no change in the tumultuous environment and decisions continued to be upended.

44.    Cunningham's formal complaint and the lack of action resulted in the affirmation that Oliver was not a safe space to bring complaints of racial discrimination and disparate treatment.

45.    In January 2021, Davis was set to be hired as Director to the DTC team.  On or around January 18, 2021, just before Davis was scheduled to start, Cunningham reached out to Castro to address another complaint about Plattner's behavior of overturning decisions and expressed, "we cannot have Sania [Davis] enter this type of environment and we cannot re-live the frustrations from 2020" – alluding to the challenges faced in the previous year regarding complaints, overturning of decisions and bullying, previously faced by Zachary.

12

46.     Soon after Davis started her employment at ViacomCBS, she noticed a lack of support, lack of representation, and uneven allocation of resources.  During her first month of employment, Davis was made aware of the reason for the departure of Rich Morris (VP of Global Franchise Planning) and Zachary (the previous Director of Direct to Consumer/Ecommerce). Morris had worked at Viacom and then ViacomCBS for over 8 years, and he had a lot of personal experiences shared by former Black employees before his departure.  The Associate Art Director, Gerald Yarborough, who also expressed similar experiences, departed from ViacomCBS in April 2021.  Both Morris and Yarborough expressed concerns and frustrations that had never been addressed.

47.     In or around February 2021, a few weeks into Davis' employment, she started having difficulties executing her job duties due to Plattner and Klecker and she experienced the tumultuous environment of the DTC team.  The marketing team was not coordinating with the DTC team – they were not informing the DTC team of deadlines and marketing tasks, and this caused a negative impact to the DTC business.  Due to not meeting requirements and performing tasks as required, this impacted the business goals set by the DTC team.  Despite numerous communications by Cunningham to Castro to resolve these problems, the marketing team was not being held accountable for its lack of performance.  During a roundtable meeting on Febuary 5, 2021, Cunningham, Davis, Castro, Dewanda Howard (assistant of Mr. Castro), Kenny Martinez, Gemma Lawson, Plattner, Klecker, the DTC team and Marketing team discussed several subjects, including the DTC coordination calendar.  Cunningham prepared several documents and processes to facilitate the management of business and explained the importance of coordinating the Marketing and DTC teams.  Klecker provided excuses for the Marketing team, stating first that they had filled out the coordination calendar, then that they did not have access to the calendar.

During this meeting over Zoom, Klecker kept talking over Cunningham.  Castro interjected once, asking Klecker to "please let Aaron speak."  However, the behavior continued and Klecker continued to interrupt Cunningham.  Finally, Cunningham responded, "I find it disrespectful that you are not allowing me to finish my sentence.  I'm not going tolerate these untruths."  Castro continued to allow Klecker to talk over Cunningham and declined to step in.  In a private message to Davis in the Zoom chat, Castro apologized for the tension and stated, "I'm sorry that you have to experience this, but this has to happen – it was a long time coming."  To the teams, Castro stated, "I'm not going to referee this shit anymore."

48.    After this meeting, Castro met with Cunningham and told him that Klecker had approached Castro and told him that Cunningham called Klecker a liar.  Castro asked Cunningham to apologize to Klecker.  Cunningham rebutted this request, asking why Klecker's earlier behavior had not been addressed.  Castro told him that he would ask everyone to apologize to everyone, but provided that Klecker was not asked to apologize.  Cunningham responded, "we can't move forward in this way."  Castro then reached out to Cunningham after this discussion as to what the next steps would be.

49.    On or around March 2021, Gerald Yarborough ("Yarborough") (Associate Art Director) notified Cunningham of communications that had been received by other employees from Castro.  Yarborough stated that he and others had received calls and communication from Castro asking employees to bring up and file any complaints about Cunningham.  Yarborough told Cunningham to "be very careful about Jose Castro because he has reached out to myself and others and is encouraging us to form complaints about you and to go to Human Resources for complaints against you."  Yarborough also notified Davis that Castro and Alana Visco, VP Fashion

Collaborations and Specialty Retail, were trying to compile complaints against Cunningham. Both Cunningham and Davis felt helpless to address this situation.

50.     After the February 5, 2021 meeting, Cunningham and Davis experienced multiple instances of disparate treatment. In one instance, both the Daily Show Dogs and Tales from the Trip were initiatives that had been analyzed by the DTC team as non-viable businesses that were not supposed to go forward. Despite the analysis, the decisions made by Cunningham and Davis were overturned, but the subpar performance of the business reflected on Cunningham and Davis.

51.     In March 2021, during an approved vacation, Cunningham delegated his duties to Davis. During March 16-19, Davis experienced aggressive interactions with Plattner during a Zoom meeting, where Plattner demanded in front of colleagues that Davis make product commitments that Davis and Cunningham did not agree with and that were not in the best interest of the business. Davis presented objective data to show that certain products should not be created for the DTC business. This had been corroborated and affirmed by Cunningham. Despite the financial analysis by the DTC team, Plattner pushed Davis to go forward with initiatives, stating, "What I need to hear from you right now is that you are going to add this back to the Product Roadmap." Due to the uncomfortable nature of the exchange, Davis reached out to Castro for guidance. Castro suggested that Davis reach out to Plattner directly. Thereafter, Davis called Plattner to discuss the situation, in which she reprimanded Davis, gave unsolicited feedback on Davis' performance, and called her "combative." Plattner added, "when I interviewed you as a Vice President, I was not expecting this behavior." Davis came out of this call shaken, and unsure of how to proceed in this situation. She reached out to Cunningham, detailing the interactions with Plattner and addressing complaints directed to Castro that went unresolved. Despite being on his vacation, Cunningham called Davis to address these concerns, and Davis was audibly distressed.

Cunningham was fearful that Davis was ready to quit, and he felt it urgent to escalate these complaints. Davis' experiences also reflected similar behavior that Cunningham experienced, and Cunningham immediately reached out to Pam Kaufman ("Kaufman"), President of Consumer Products, and to Talia Robinson (Senior Vice President of Human Resources) to formally document Davis' urgent concerns combined with his own similar past concerns. Cunningham later detailed the incidents reported by Davis and corroborated similar experiences of differential treatment in an email in or around April 2021.

52.     Despite ongoing investigations and previous complaints, the racially hostile environment and disparate treatment continued towards Cunningham and Davis. For example:

•     When addressing the issue between the DTC team and Marketing team, Castro required Cunningham to produce verification of the events, something not required of Plattner.

•     Plattner would reach out directly to the product partners, such as Snow, to change directives previously assessed by the DTC team and overturn decisions.

•     Davis received emails from Klecker berating Davis and Cunningham for having contact with partners that reached out to the DTC team regarding products.

•     Davis and Cunningham continued to receive feedback that they were "combative," "aggressive," "intense" or "threatening," which are micro-aggressive descriptors not described of other non-Black employees.

•     Davis and Cunningham experienced several instances where their expertise and experiences were downplayed and dismissed over the opinions of Plattner and Klecker.

53.     A Human Resources and employee relations investigation was launched at some point after the March 2021 incident. Cunningham spoke to Jennifer Gordon ("Gordon") (Vice

16

President of Employee Relations), who reached out to him on March 22, asking to meet with him the same day.  During the conversation, Gordon said the company had launched an investigation, though she did not say what it was in relation to or why it was initiated.  Gordon was doing an intake and asked Cunningham to talk through his experience and interactions with Castro, Oliver, Klecker and Plattner.  Cunningham stated that he prided himself on creating a safe space, but could not consistently do so due to the environment in which he worked.  He went through the incidents and complaints and expressed concern of retaliation.  Gordon brought up that Castro was the President of Latinx Employee Resource Group, but did not articulate how that would have any impact on the incidents that Black employees had experienced.  Gordon did not give insight to the investigation and asked Cunningham to compile information and send any supporting evidence.

54.     On March 21, 2021, Cunningham spoke with Kaufman about the complaints and impact on business, and requested advice.  Cunningham was told that there was already an investigation and that Gordon had requested Kaufman not to discuss complaints, and Kaufman advised, "please be honest and share as much documentation as possible with Jennifer Gordon. Please trust the process and that everything will be handled appropriately."  Cunningham set up a time separately on April 2, 2021 with Talia Robinson, Senior Vice President of Human Resources, to walk through all of the experiences and complaints.

55.     Gordon contacted Davis on March 22, 2021, to discuss challenges with the DTC team and cross-functional partners. Davis gave an accounting of her experiences as a Black executive at ViacomCBS and her interactions and experiences with Castro, Plattner and Klecker. Davis also expressed fear of retaliation.

56.     On April 6, 2021, Mr. Cunningham sent a summary of grievances to Gordon, detailing patterns of differential treatment that "appeared to be based on race."  Cunningham provided documentation of experiences, treatment and complaints that went unresolved.

57.     On April 22, 2021, Gordon requested a follow-up meeting with Davis to "get some additional information" about Davis' concerns.  Fania Washington ("Washington"), Senior Vice President of Employment Law Team, was requested by Gordon to be in attendance.  On April 26, Gordon and Washington met with Davis via Zoom to discuss concerns that she had raised in her initial meeting with Gordon, and to explain her statement that this was an "anti-Black environment."  Davis explained the overturning decisions, the DTC team frequently being understaffed, being asked to provide additional verification or proof that was not asked of white colleagues, even when presenting objective data, a "double standard of support/bias from management," and the "hemorrhaging of Black talent within the Consumer Products organization." Gordon and Washington took notes, and Washington asked clarifying questions. Gordon requested that Davis send additional examples and documents that supported these claims, which Davis provided on May 9, 2021.

58.     Around April 26, 2021, Cunningham also was contacted by Gordon to have a meeting with Washington, who he knew as the employment law risk mitigation attorney.  This conversation was more of an interview, where Cunningham dove into details and was asked clarifying questions about incidents with Plattner, Klecker and Castro.  Cunningham observed that Washington seemed more open to hearing (she was asking questions, taking notes, etc).  Gordon asked, "why couldn't you successfully execute the launch of BET while successfully managing the business" – to which Cunningham explained that there had been a lack of resources and staffing.  Gordon continued to question Cunningham as he tried to explain and Washington replied

that, "what Aaron was trying to say is that, all things being equal, if Aaron had the same resources as expected, the launch of BET would have been successful."  Cunningham agreed with this statement.

59.    On May 19, 2021, Gordon scheduled final investigation Zoom calls with Cunningham and Davis and included Oliver in these meetings.  During the meetings, Gordon reviewed some of the highlights of the investigation closure letters that Cunningham and Davis eventually received on May 27.  Gordon reviewed the concerns and provided feedback to Davis and Cunningham.

60.    The closure of the investigation seemed favorable to an extent, given that the investigation found that the experiences and complaints had been corroborated: "we did corroborate that there were communications & meetings where Plattner and Klecker did not act appropriately" and that Plattner and Klecker "were not following business protocol."  The closure letter stated that the findings for bias occurred, but not that they were racially motivated.  During the call with Cunningham, Oliver spoke out against Cunningham, stating sarcastically, "maybe you should go to Talia Robinson on these types of issues moving forward; you should go to Talia since you feel more comfortable going to her."  Gordon was forced to step in and said to Cunningham, "if you don't feel comfortable going to Courtney, you can always come directly to me."  During the call with Davis, these findings were discussed, but Gordon and Oliver provided feedback to Davis that her performance was not collaborative.  This was feedback not previously mentioned to Davis and she felt blindsided by the feedback.

61.    Davis and Cunningham were told that there would be meetings with the Diversity, Equity and Inclusion ("DEI") Team, including Marva Smalls (Executive Vice President of Global Inclusion).  However, there was no additional communication from the DEI Team or Marva Smalls

to discuss the disparate treatment, next steps, and the DTC team and business. Cunningham and Davis also were informed that the DTC would have meetings to discuss and put in place cross-functional partners to support the DTC team (franchise support and marketing support). However, these meetings were not put into place and the decisions for the team were made without discussion with the DTC team.

62.     There seemed to be no disciplinary action or behavioral conversations with Castro, Plattner and Klecker to hold anyone accountable for the incidents prior.

63.     On May 26, 2021, there was a meeting with Castro, DTC team, Leahan and Eleanor Lee ("Lee") (Senior Manager of Marketing). Castro discussed the DTC team goals and stated it was a hard reset on the DTC team and the way that everyone was working together. He stated that Lee would provide marketing support to the DTC team, and that Klecker would be moving to the Amazon team, that Veronica Hart (EVP of Global Franchise Planning, supervisor to Plattner) would be following up with Plattner to discuss cross-team issues and next steps, and that another team member on the marketing team would support the social media aspect of DTC. On May 27, Castro sent a summary email to the DTC team. However, in this email and subsequent meetings regarding the DTC team, financial viability was never discussed. He also did not address marketing in his email.

64.     On May 27, 2021, Castro rescheduled one-on-one meetings with Davis from a bi-weekly basis to a monthly basis. Davis questioned this decision and asked Dewanda Howard (Executive Assistant to Castro) why the meetings were being rescheduled to a monthly basis, and Howard informed Davis that he would continue his bi-weekly only to direct reports. Despite this, Davis was aware that Castro met with Leahan, DTC Manager and an employee reporting to Davis, on a more frequent basis.

65.     Cunningham had previously discussed with Castro that Lee would support the DTC team, but despite the conversation and meetings, the support was not received for the DTC team. Lee was not moved to the DTC team, and another team member for social media previously mentioned was not provided to the DTC team.  Despite notices that the marketing team would also lean in to support the DTC team, there was no follow up.  On June 2, 2021, there was a 15-minute meeting with all of Castro's line of business.  Davis thought that the marketing support and structural changes would be discussed; but, they were not discussed and Davis felt that it was not the appropriate forum to bring up the DTC support requests.

66.     Also on June 2, 2021, Cunningham spoke to Yarborough, who suggested that Cunningham speak to Jason Williams ("Williams"), SVP of Diversity, Equity and Inclusion.  On June 18, 2021, Cunningham spoke to Williams.  Williams provided that, although investigations of a racial bias are forwarded to the DEI team, the DEI team had not received any communication about this investigation.  Around this time, Yarborough encouraged Davis to submit complaints through a portal, however, Davis was at a point where she did not know who she could trust and did not file a complaint through the portal.

67.     On June 21, 2021, Castro asked for an emergency meeting.  On June 22, 2021, there was a group meeting scheduled with Oliver from Human Resources, Veronica Hart, Cunningham and Davis regarding the BET marketplace launch.  It was unclear as to why Oliver was on the call, as she was a part of Human Resources and not the DTC team.  Castro asked for the financial modeling of the BET marketplace and how it would operate.  Castro did not understand the financial breakout, and Cunningham and Davis spoke about the financials of the BET marketplace and inventory.  Castro kept asking for sales projections for a business that did not currently exist, although BET was a piece of a larger BET business.  Even though Harper & Scott was creating

the website, that firm was not able to provide a financial forecast and it is unclear as to whether Castro requested it. There was no financial return on investment breakout supporting BET's brand image and the business initiative. On June 23, 2021, Castro held a larger meeting regarding the BET efforts. During this meeting, the BET marketplace efforts were asked to be put on hold while Hart and Staci Hallmon, SVP at BET, would regroup and discuss the DTC BET marketplace initiative with Kim Paige, EVP & CMO of BET.

68. There was a general negative sentiment around Black consumerism and an unwillingness to help further promote Black brands within the company portfolio such as BET, Nick Cannon and the Wild n Out franchise, Desus & Mero and Ziwe on Showtime. That attitude was reflected in the lack of resourcing and unequal support given to Black brands. Often, requests from Black talent such as Nick Cannon and Executive Producers of Desus & Mero were rebuffed by Castro, Plattner and Hart.

69. Cunningham had a touchbase with Castro on June 23, 2021, during which Castro expressed frustrations about the marketplace and viability of the DTC business. This was the first time Cunningham had received any concerns about the financial viability of the DTC business. Cunningham pointed out that the DTC team was on track to hit the $10 million goal. Cunningham also brought up examples of decisions made that reflected on the DTC team that had not been promoted by the DTC team – that the decisions of financial viability were not taken into consideration for certain initiatives such as Comedy Central, Daily Show Dogs, Tales from the Trip and Yellowstone, where DTC team had made a decision not to move forward and the decisions were overturned. Cunningham explained that these outside decisions ended up being a loss to the DTC team, and that DTC was being held accountable despite DTC recommendations. Castro continued to ask questions regarding the how the DTC business functioned and did not

seem to understand Cunningham's explanations of the DTC business models and retail math principles.  Instead of relying on Cunningham's expertise, Mr. Castro stated "I don't want a story to be told that BET is not profitable at launch."  At the end of this meeting, Cunningham felt that this meeting had not resulted in a productive conversation; rather, it was building a foundation to find fault with the DTC business.  He felt that a part of his complaint was still not addressed – that his expertise had previously been dismissed, and that currently, despite his thorough explanations, he was being blamed for a lack of immediate profitability, when no site or business was profitable at launch.

70.     On June 14, 2021, Davis encountered a situation where she asked Leahan to follow up on work that had previously been requested in April 2021.  Davis provided a deadline to complete the task.  On June 15, 2021, Leahan pushed back against the deadline, saying that the deadline was too short, and that the task would take hours upon hours.  Leahan also expressed that this work was beneath her.  Davis performed part of this task to show Leahan that it was a level of work that could be done at any role and within the time constraints provided, and detailed an outline of how much time the task should take.  Because this was a point of conflict, Davis provided this information in an email to Leahan, and cc-ed Mr. Cunningham, who was out of the office. The same day, Leahan interrupted Ms. Davis' one-on-one meeting with an intern.  Leahan ranted at Davis immediately, stating that this level of work was under her, and expressed, "why did you send that email to Aaron?  I felt like you were trying to be an asshole by sending that and copying him."  Davis was taken aback by this unprofessionalism and asked, "excuse me?"  Leahan repeated her comment that Davis was being an "asshole."  Davis replied, "Aaron is my manager, we were clearly at an impasse and that this is something that needs to be addressed."

71.     Davis sent a summary of events to Cunningham via email, so he was aware of the incident in which Leahan called Davis an "asshole," and sent email correspondence between Leahan and Davis that seemed to trigger the outburst.  Davis asked through email not to have one-on-one interactions, but rather, someone be present in future interactions between Leahan and Davis.  On June 16, 2021, Davis met with Cunningham to discuss the "asshole" incident and he advised he would be escalating this to Castro.  Davis recapped the conversation with Leahan and Cunningham was shocked, especially after the hard reset meeting in which clear communication was discussed.  Cunningham also had a meeting with Leahan to recount what had happened. During this meeting, Leahan cried and stated that she "may have lost her temper because she was frustrated."  Cunningham escalated this complaint to Castro after speaking with Davis and Leahan. Cunningham shared with Castro the email received from Davis, that the situation was concerning, and asked for next steps.  Castro seemed frustrated and stated that he would talk to Oliver to best approach this situation.

72.     When Cunningham followed up with Castro during the upcoming days, especially since tensions were high, Castro stated that Leahan acted inappropriately, but he put blame on Davis' management style and that Leahan had complained previously about Davis' management style.  Cunningham asked Castro not to deflect the behavior, and that this required a resolution. Castro, however, seemed to side with Leahan, and believed Leahan's story that she had called herself an asshole.  Cunningham proceeded to assist Davis by sitting in on Davis and Leahan's one-on-ones and was copied on any emails to prevent misunderstandings.  Cunningham did not observe any instance in which Davis improperly interacted with Leahan.

73.     On June 17, 2021, Davis sent Gordon and Talia Robinson ("Robinson"), SVP Human Resources, a follow-up to the investigation closure letter highlighting some inaccuracies,

as it claimed that Davis had made allegations that she had not.  Davis explained that the tone of closure letter implied that the basis for investigation being opened was the result of previous complaints, but that this was not clear from the timeline of events.  In the same email correspondence to Gordon and Robinson, Davis outlined the incident with Leahan in which Leahan called Davis an "asshole."

74.    On June 23, 2021, there was a one-on one conversation between Castro and Cunningham, in which Castro said that Cunningham did not handle the situation with Davis and Leahan properly, that he should have mediated it properly, and that he should have listened to Leahan.  Castro asserted that, despite his offer to reach out to Oliver, Cunningham should have reached out to Oliver directly, rather than approaching him. Castro also asserted that it was improper and unacceptable that Davis had cancelled all meetings with Leahan, to which Cunningham correctly noted that Davis had not cancelled all meetings with Leahan, but rather, added Cunningham to the individual meetings.  Cunningham also explained that the failure to inform Castro about the incident would have been negligence on his part, and that he felt that it he had an obligation to inform Castro.  Cunningham also stated that, if Castro felt that he should have reached out directly to Oliver, Castro should have asked him to do so instead of Castro telling him that Castro would approach Oliver.

75.    On June 24, 2021, Castro finally scheduled a meeting with Davis to get her accounting of the "asshole" incident.  By this time, Cunningham confirmed that Castro and Leahan had spoken prior to this, despite Davis being the aggrieved party.  Castro confirmed that the entirety of Davis' account had been corroborated by Leahan, with the exception of the "asshole" statement.  Instead, Leahan alleged that during the conversation, she had called herself an asshole, rather than calling Davis an asshole.  Davis observed that there was a presumption of innocence in

favor of Leahan, in that Castro maintained his belief that Leahan's version of events was deemed accurate over Davis' version.  Castro asked Davis, "was there anything you would have done differently?" – which seemed to imply that Davis had done something wrong or mishandled the situation.  Castro concluded by suggesting that Cunningham continue to attend the one-on-one meetings with Leahan in the interim.  The uncomfortable environment continued and there was no resolution to the complaint.

76.     On July 15, 2021, Cunningham received a "Letter of Warning" and Davis received a "Performance memo" based on incorrect descriptions of incidents and inaccurate goals and/or expectations.

77.     Within Cunningham's letter, he was accused of not managing his team well.  The letter stated that, during the latest incident, Cunningham did not give Leahan a chance to explain and that Cunningham did not investigate.  This was contrary to the fact that Cunningham had spoken to both Davis and Leahan prior to informing Castro of the complaint.  The letter of warning alleged other inaccurate facts regarding Cunningham's employment and Castro expressed that Cunningham's performance was poor and that they "must re-evaluate our entire DTC strategy and determine if this is a viable business for us."

78.     Davis was scheduled to have a one-on-one video meeting with Castro, but Oliver was present on the video.  Davis had set an agenda of things to discuss, but instead, Castro sent her a Performance Memo, expressed concern of financial viability, and alleged that some business initiatives would operate at a significant loss despite never having been launched.  Davis was blindsided, especially as the memo contained a number of inaccuracies, including Davis' position (listed on the memo as "Manager" rather than "Director").

79.     These performance-related letters were given to Davis and Cunningham despite both Cunningham and Davis being on track to exceed the financial goals for the year.  The letters added that, despite these issues not previously addressed, "These are concerns that we have discussed in the past, and it is very troubling that they continue."  In the letter to Davis, she was told that performance improvement was required and that the company would have to evaluate the DTC business.  However, there were no concrete examples of how to improve performance, no timeline for performance improvement, and nothing that indicated the how performance improvement would be analyzed.  As Castro read through this letter, Davis rebuffed every point during the video meeting.  Oliver did not comment much during this meeting, other than pointing out Davis' reactions (*e.g.*, "you look surprised").  Davis objected to the conclusory nature of this memo and did not sign the memo.

80.     Cunningham and Davis were not able to respond to the letters prior to ViacomCBS terminating their employment.  There was no additional follow-up or meeting regarding the performance memo to Davis until August 4, 2021, during the regularly scheduled one-on-one meeting with Castro.  During that meeting on August 4, 2021, Castro stated to Davis that they had analyzed the financials of the business and that the DTC team would be dissolved.  Knowing that citing an issue with Cunningham and Davis' purported job performance would not be reason enough, Castro pursued the termination of Cunningham and Davis' employment in a different and pretextual manner.  Castro stated that the decision to dissolve the team was not performance based, but rather that there was a low financial viability of the DTC business succeeding and asserted that DTC was losing half a million dollars.  Mr. Castro stated that they tried to look into using the DTC marketing budget to retain the DTC team, but that this was not viable.  This was inaccurate, as the marketing budget was $550,000, and this would have covered the salary of all three people on the

DTC team.  Castro stated that the DTC would be dissolved and that all employees of the DTC team – Cunningham, Davis and Leahan – would be let go.

81.    Castro also had a meeting with Cunningham: it was a fairly short meeting, only 9 minutes long.  Cunningham was surprised as it was still in the 30-day period after the warning letter. Castro immediately jumped in and said that "based on the financial viability of the DTC business we need to make changes to the DTC business structure and that we need to be somewhat profitable, we are going to take a light-touch approach to the DTC business; we made the difficult decision to dismantle the DTC team."  Castro explained that all DTC roles were being eliminated, and that they would remain a light touch approach to the DTC business.  Castro stated that there would be a transition and that Oliver would be in touch regarding the next steps.  Castro requested that Cunningham not contact Davis and Leahan regarding these changes.  Cunningham asked whether there were opportunities for Leahan and Davis to remain at ViacomCBS, but Castro stated that there were no opportunities to retain them.  Castro stated that he wanted to carve out time to tie up any loose ends before that Friday (the official last day for both Cunningham and Davis).  Yet, Castro was not available to tie up any loose ends, and he did not set up time to meet with Cunningham.

82.    Castro only set up meetings with the franchise teams and did not invite Cunningham and Davis.  Cunningham was made aware of this by franchise counterparts and that Castro had announced that Alana Visco would be the new VP of DTC.  The franchise counterparts stated that it also was not certain whether any decision had been made as to whether Leahan would be terminated.

83.    Oliver met with Cunningham and Davis separately during their last day.  Oliver provided them with severance agreements and encouraged both Cunningham and Davis to apply

for positions at ViacomCBS.  Davis was told to send her application directly to Oliver.  Prior to

their terminations, Davis and Cunningham were not provided with an opportunity to respond to

the performance-related letters received on July 15, 2021.  Due to these unsubstantiated letters,

Cunningham and Davis reasonably believed that they would not be able to apply for positions at

ViacomCBS, including the Global SVP position for ecommerce, despite their experience.

84.     Despite the assertion that the DTC team had been dissolved and that Davis and

Cunningham's Slack (messaging application) and email had been disconnected, Leahan's email

and Slack had not been disconnected.  On August 11, 2021, Serenity Cray ("Cray"), a Black Retail

Action Group (aka B.R.A.G.) DTC intern, reached out to Davis for advice.  She had received an

email from Alana Visco introducing herself as the new Vice President to the DTC team, but this

was someone that Cray was not informed of.  Thus, based upon information available and to be

uncovered during discovery in this lawsuit, Cunningham and Davis believe that the DTC team was

never dissolved – rather, it was mere pretext in continuing a campaign of racial discrimination,

hostility and retaliation against them as Black employees who had complained of such practices.

85.     The inexplicable conduct described above, which is egregious and was condoned

by ViacomCBS, demonstrates a willful and reckless disregard for Plaintiffs' rights, and has caused

and will continue to cause them humiliation, embarrassment, physical illness, pain and suffering,

as well as damage to their reputation and career.

86.     Plaintiffs have also suffered lost wages and benefits, and they have legitimate

concerns that they will continue to do so in the future.

## FIRST CAUSE OF ACTION
### (Race Discrimination and Harassment Under 42 U.S.C. § 1981)

87. Plaintiffs incorporates herein by reference each and every allegation in the preceding paragraphs, as if set forth herein in their entirety.

88. As described above, Defendants' employment decisions and harassing conduct concerning Plaintiffs, including those decisions and conduct by ViacomCBS and its management, were based on their race, in a violation of 42 U.S.C. § 1981.

89. ViacomCBS was aware or should have been aware of the conduct alleged herein by its decision-makers, but failed to take appropriate action in response thereto, and thus is liable under § 1981 for the unlawful conduct toward Plaintiffs.

90. As a direct and proximate result of ViacomCBS' unlawful conduct toward Plaintiffs in violation of § 1981, each Plaintiff has sustained the injuries, damages and losses set forth herein and has incurred attorneys' fees and costs.

91. ViacomCBS' conduct was willful, wanton and demonstrated a conscious disregard for Plaintiffs' rights under § 1981, and this conduct warrants the imposition of punitive damages.

92. Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages as a result of ViacomCBS' unlawful conduct unless and until this Court grants the relief requested herein.

## SECOND CAUSE OF ACTION
### (Retaliation Under 42 U.S.C. § 1981)

93. Plaintiffs incorporates herein by reference each and every allegation in the preceding paragraphs, as if set forth herein in their entirety.

94. As described above, ViacomCBS retaliated against Plaintiffs for their complaints about race discrimination.

95.     ViacomCBS was aware or should have been aware of the conduct alleged herein by its decision-makers, but failed to take appropriate action in response thereto, and thus is liable under § 1981 for the unlawful conduct toward Plaintiffs.

96.     As a direct and proximate result of ViacomCBS' unlawful retaliation toward Plaintiffs in violation of § 1981, each Plaintiff has sustained the injuries, damages and losses set forth herein and has incurred attorneys' fees and costs.

97.     ViacomCBS' conduct was willful, wanton and demonstrated a conscious disregard for Plaintiffs' rights under § 1981, and this conduct warrants the imposition of punitive damages.

98.     Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages as a result of ViacomCBS' unlawful conduct unless and until this Court grants the relief requested herein.

## THIRD CAUSE OF ACTION
### (Race Discrimination and Harassment Under Title VII)

99.     Plaintiffs incorporates herein by reference each and every allegation in the preceding paragraphs, as if set forth herein in their entirety.

100.    As described above, ViacomCBS' employment decisions and harassing conduct concerning Plaintiffs were based on their race, in a violation of Title VII.

101.    ViacomCBS was aware or should have been aware of the conduct alleged herein by its decision-makers, but failed to take appropriate action in response thereto, and thus is liable under Title VII for the unlawful conduct toward Plaintiffs.

102.    As a direct and proximate result of ViacomCBS' unlawful conduct toward Plaintiffs in violation of Title VII, each Plaintiff has sustained the injuries, damages and losses set forth herein and has incurred attorneys' fees and costs.

103.   ViacomCBS' conduct was willful, wanton and demonstrated a conscious disregard for Plaintiffs' rights under Title VII, and this conduct warrants the imposition of punitive damages.

104.   Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages as a result of ViacomCBS' unlawful conduct unless and until this Court grants the relief requested herein.

### FOURTH CAUSE OF ACTION
### (Retaliation Under Title VII)

105.   Plaintiffs incorporates herein by reference each and every allegation in the preceding paragraphs, as if set forth herein in their entirety.

106.   As described above, ViacomCBS retaliated against Plaintiffs for their complaints about race discrimination.

107.   ViacomCBS was aware or should have been aware of the conduct alleged herein by its decision-makers, but failed to take appropriate action in response thereto, and thus is liable under Title VII for the unlawful conduct toward Plaintiffs.

108.   As a direct and proximate result of ViacomCBS' unlawful retaliation toward Plaintiffs in violation of Title VII, each Plaintiff has sustained the injuries, damages and losses set forth herein and has incurred attorneys' fees and costs.

109.   ViacomCBS' conduct was willful, wanton and demonstrated a conscious disregard for Plaintiffs' rights under Title VII, and this conduct warrants the imposition of punitive damages.

110.   Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages as a result of ViacomCBS' unlawful conduct unless and until this Court grants the relief requested herein.

## FIFTH CAUSE OF ACTION
### (Race Discrimination and Harassment Under the CHRL)

111.    Plaintiffs incorporates herein by reference each and every allegation in the preceding paragraphs, as if set forth herein in their entirety.

112.    As described above, the Plaintiff's race played a role in ViacomCBS' employment decisions and harassing conduct concerning Plaintiffs, in a violation of the CHRL.

113.    ViacomCBS was aware or should have been aware of the conduct alleged herein by its decision-makers, but failed to take appropriate action in response thereto, and thus is liable under the CHRL for the unlawful conduct toward Plaintiffs.

114.    As a direct and proximate result of ViacomCBS' unlawful conduct toward Plaintiffs in violation of the CHRL, each Plaintiff has sustained the injuries, damages and losses set forth herein and has incurred attorneys' fees and costs.

115.    ViacomCBS' conduct was willful, wanton and demonstrated a conscious disregard for Plaintiffs' rights under the CHRL, and this conduct warrants the imposition of punitive damages.

116.    Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages as a result of ViacomCBS' unlawful conduct unless and until this Court grants the relief requested herein.

## SIXTH CAUSE OF ACTION
### (Retaliation Under the CHRL)

117.    Plaintiffs incorporates herein by reference each and every allegation in the preceding paragraphs, as if set forth herein in their entirety.

118.    As described above, ViacomCBS retaliated against Plaintiffs for their complaints about race discrimination.

119.     ViacomCBS was aware or should have been aware of the conduct alleged herein by its decision-makers, but failed to take appropriate action in response thereto, and thus is liable under the CHRL for the unlawful conduct toward Plaintiffs.

120.     As a direct and proximate result of ViacomCBS' unlawful retaliation toward Plaintiffs in violation of the CHRL, each Plaintiff has sustained the injuries, damages and losses set forth herein and has incurred attorneys' fees and costs.

121.     ViacomCBS' conduct was willful, wanton and demonstrated a conscious disregard for Plaintiffs' rights under the CHRL, and this conduct warrants the imposition of punitive damages.

122.     Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages as a result of ViacomCBS' unlawful conduct unless and until this Court grants the relief requested herein.

### SEVENTH CAUSE OF ACTION
**(Race Discrimination and Harassment Under the SHRL)**

123.     Plaintiffs incorporates herein by reference each and every allegation in the preceding paragraphs, as if set forth herein in their entirety.

124.     As described above, ViacomCBS' employment decisions and harassing conduct concerning Plaintiffs were based on their race, in a violation of the SHRL.

125.     ViacomCBS was aware or should have been aware of the conduct alleged herein by its decision-makers, but failed to take appropriate action in response thereto, and thus is liable under the SHRL for the unlawful conduct toward Plaintiffs.

126.     As a direct and proximate result of ViacomCBS' unlawful conduct toward Plaintiffs in violation of the SHRL, each Plaintiff has sustained the injuries, damages and losses set forth herein and has incurred attorneys' fees and costs.

127.    Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages as a result of ViacomCBS' unlawful conduct unless and until this Court grants the relief requested herein.

## EIGHTH CAUSE OF ACTION
### (Retaliation Under the SHRL)

128.    Plaintiffs incorporates herein by reference each and every allegation in the preceding paragraphs, as if set forth herein in their entirety.

129.    As described above, ViacomCBS retaliated against Plaintiffs for their complaints about race discrimination.

130.    ViacomCBSwas aware or should have been aware of the conduct alleged herein by its decision-makers, but failed to take appropriate action in response thereto, and thus is liable under the SHRL for the unlawful conduct toward Plaintiffs.

131.    As a direct and proximate result of ViacomCBS' unlawful retaliation toward Plaintiffs in violation of the SHRL, each Plaintiff has sustained the injuries, damages and losses set forth herein and has incurred attorneys' fees and costs.

132.    Plaintiffs are now suffering and will continue to suffer irreparable injury and monetary damages as a result of ViacomCBS' unlawful conduct unless and until this Court grants the relief requested herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor and against ViacomCBS, and grant to them the following relief:

A.      A declaratory judgment that the actions, conduct and practices of ViacomCBS complained of herein violate 42 U.S.C. § 1981, Title VII, the CHRL and the SHRL;

B.      An award for all economic damages to be determined at trial, plus pre- judgment interest, to compensate Plaintiffs for the unlawful conduct, including back pay, front pay and lost benefits;

C.      An award for all compensatory damages to be determined at trial, plus pre-judgment interest, to compensate Plaintiffs for any future pecuniary losses, and their emotional distress, pain, suffering, inconvenience, mental anguish, stress, anxiety, humiliation, embarrassment, loss of enjoyment of life, physical illness and other nonpecuniary losses as allowable;

D.      An award for punitive damages under 42 U.S.C. § 1981, Title VII the CHRL and/or SHRL, in an amount to be determined at trial;

E.      An award and order to reinstate Plaintiffs to their jobs at ViacomCBS;

F.      An award for the costs incurred in this lawsuit, together with reasonable attorneys' fees; and

G.      An award for such other and further relief as this Court deems appropriate.

## <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury on all issues of fact, their claims and damages herein.

Dated:  July 12, 2022

CERASIA LAW LLC

By _____

Edward Cerasia II
101 Eisenhower Parkway, Suite 300
Roseland, New Jersey 07068
646.525.4231
ed@cdemploymentlaw.com

-and-

EQUAL RIGHTS LAW GROUP
Mika Hilaire (to be admitted *pro hac vice*)
15233 Ventura Blvd. Ste 420,
Sherman Oaks, California 91403
818.305.6297
mika@equalrightslawgroup.com

Attorneys for Plaintiffs
  *Aaron Cunningham and Sania Davis*